Michael Zoldan; AZ Bar No. 028128
Jessica Miller; AZ Bar No. 031005
**ZOLDAN LAW GROUP, PLLC**
14500 N. Northsight Blvd., Suite 213
Scottsdale, AZ 85260
Tel & Fax: 480.442.3410
mzoldan@zoldangroup.com
jmiller@zoldangroup.com

Attorneys for Plaintiff
Kimberley Johnston

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| **Kimberley Johnston**, an Arizona resident,<br><br>Plaintiff,<br><br>v.<br><br>**Fender Musical Instruments Corporation**, a Delaware Corporation,<br><br>Defendant. | Case No.<br><br><br>**VERIFIED COMPLAINT**<br><br>**(Jury Trial Requested)** |

Plaintiff Kimberley Johnston ("**Johnston**"), for her Verified Complaint against Defendant Fender Musical Instruments Corporation ("**Fender**"), hereby alleges as follows:

## PARTIES

1.  Plaintiff is, and at all times relevant hereto was, a resident of Maricopa County, Arizona. At all times relevant to this lawsuit, Johnston was an "employee" of Fender as defined in the Americans with Disabilities Act and the Americans with Disabilities Act Amendments Act, 42 U.S.C.A. § 12101, *et seq*. (collectively referred to herein as the "**ADA**").

2.  Upon information and belief, Fender is authorized to conduct business and is

currently doing business in the State of Arizona. At all times relevant hereto, Fender was Johnston's "employer" as defined in the ADA.

## JURISDICTION AND VENUE

3. All acts complained herein occurred in Maricopa County, Arizona, and this Court has jurisdiction over the parties and subject matter set forth in this Complaint pursuant to the ADA.

4. This Court has federal question subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 in that the claims set forth in this Complaint arise under federal law.

5. The employment practices alleged to be unlawful were committed within, and had their primary effect in, the jurisdiction of the United States District Court for the District of Arizona.

6. Plaintiff has exhausted all administrative and statutory prerequisites necessary to commence this action, and therefore jurisdiction is proper.

7. Personal jurisdiction in this Court is proper.

8. Venue in this Court is proper.

## FACTUAL ALLEGATIONS

9. Johnston commenced employment with Fender in 2007 as a Collection Specialist, working most recently as an Accounts Payable Specialist.

10. Johnston consistently met and exceeded expectations on annual performance reviews.

11. In July of 2010, Johnston sustained a traumatic head injury causing three fractures in her skull and several broken ribs. She required approximately three months of

medical leave for physical therapy before she could return to work.

12. Aside from the medical leave, Johnston did not request additional accommodations in 2010 and could perform the essential functions of her position without an accommodation.

13. Beginning in 2016, Johnston started experiencing intense migraines and sought treatment from a neurologist.

14. After an MRI test, it was discovered that Johnston's fractures were widening.

15. Johnston's migraines were attributed to the fact that her skull fractures were widening.

16. When Johnston is suffering from a migraine headache, she requires medical leave as an accommodation.

17. The lasting consequences of Johnston's injury also cause various mental impairments that affect Johnston's ability to think, concentrate, communicate, recall information, learn, and read.

18. Johnston also began to suffer from brief periods of confusion and memory loss, which were also attributed to the fact that her skull fractures were widening.

19. The periods of confusion and memory loss are symptoms caused by her brain injury.

20. Early in 2016, Johnston informed her supervisor, Finance Manager Michelle Sease, that she was experiencing migraine headaches and periods of confusion due to her injury.

21. Johnston also informed Sease that she needed assistance during periods of confusion if Johnston could not remember specific protocols related to marginal functions

of her job.

22. Nonetheless, and despite the symptoms of her disability, neither Sease nor anyone else at Fender communicated that Johnston was exhibiting poor work performance at that time.

23. Johnston requested accommodations in this manner monthly in meetings with Sease.

24. On each occasion, Sease would promise to modify Johnston's work expectations because Johnston has a disability.

25. Sease did not modify Johnston's work expectations, did not provide her with assistance during periods of confusion, did not report her accommodation request to human resources personnel, and did not inform Johnston that she was eligible for intermittent FMLA leave.

26. For the first nine months of 2016, Sease took no action at all in response to Johnston's accommodation requests.

27. On at least one occasion, Sease told Johnston that she cannot use her disability as an excuse for needing help or completing tasks.

28. After attending approximately nine monthly meetings and requesting accommodations without any meaningful response by Sease, Johnston complained to Tony Gianforte, Defendant's Controller.

29. On or about October 8, 2016, Johnston informed Gianforte that she had a disability and that Sease refused to assist her with any accommodations.

30. Gianforte promised to inform human resources personnel that Johnston was in need of accommodations.

31. Only one week later, Johnston was issued unprecedented corrective action by Sease.

32. Johnston had not been previously disciplined throughout her ten years of employment with Fender.

33. Sease claimed Johnston had too many errors on entries of invoices.

34. At that time, there was no objective method to evaluate error rate in the Finance Department.

35. Three months later, in January 2017, that the Finance Department imposed five new performance guidelines that measured percentage of errors, among other metrics.

36. The Department would audit ten percent of invoices sent weekly by each account specialist to review for errors in an "Error Report."

37. In March 2017, Johnston was audited. Johnston's supervisor, Senior Accounts Payable Specialist Brandi Strombeck, indicated that Johnston had failed her audit.

38. Strombeck identified errors in Johnston's invoices that occurred prior to December 2016—before the Error Report method was even imposed.

39. Strombeck insisted that she had discretion to determine whatever performance metrics she believed appropriate, even if they deviated from the written performance metrics.

40. Because she believed that she was being discriminated against, Johnston informed Strombeck that she intended to record all personnel meetings and was given permission to do so by Strombeck.

41. On April 27, 2017, Johnston complained to Fender's human resources

personnel, Margie Cashdan, that similarly-situated comparators were not disciplined for errors on important invoices, but that she was being harshly reprimanded for little or no reason at all.

42. Johnston also complained that Strombeck was overly scrutinizing her work performance.

43. Cashdan simply instructed Johnston to resolve the issues with Strombeck herself.

44. Only weeks later, Strombeck once again attempted to discipline Johnston claiming that there were errors in Johnstons' work product.

45. Instead of conducting a standard Error Report, Strombeck reviewed Johnston's entire work history and pulled invoices that contained inconsequential errors, some of which were up to six months old.

46. Strombeck scored Johnston at 86%, which included errors from six months earlier.

47. Johnston once again complained to Cashdan that the disciplinary action was not being evenly enforced and that she was being singled out.

48. Cashdan agreed that the write-up was not appropriate and modified Johnston's score to a satisfactory score of 90% accuracy, effectively invalidating the proposed disciplinary action.

49. Strombeck insisted that Johnston should be held to a 95% accuracy rate despite admitting that nobody else in the Finance Department was expected to maintain that accuracy rate.

50. Strombeck imposed a final written warning against Johnston only four days

later, on or about June 2, 2017.

51.     Strombeck admitted that Johnston's May weekly audit revealed 0% errors, but insisted that other mistakes discovered from November and January merited a final written warning.

52.     During this same meeting, Strombeck and Cashdan offered Johnston $5,000.00 to resign.

53.     Instead of resigning, Johnston requested FMLA leave due to stress caused by her continued harassment, which triggers symptoms of her disability such as migraines and psychological distress.

54.     Johnston also submitted a comprehensive complaint to Fender Human Resources unambiguously complaining of disability discrimination and retaliation.

55.     Johnston's physician determined that she needed medical leave until September 18, 2017.

56.     Johnston complied with all directives to submit medical documentation and signed a release for Fender to speak directly to her treating physician.

57.     Johnston exhausted FMLA leave.

58.     Five days before the expiration of her medical leave, on or about September 13, 2017, Johnston submitted medical documentation requesting to extend her medical leave until October 16, 2017.

59.     Fender indicated that the note was insufficient to merit an extension of her medical leave and instructed Johnston to contact Jacquelyn Kreuger, Senior HR Business Partner by September 22, 2017.

60.     As directed, Johnston contacted Kreuger in order to discuss her continuing

need for medical leave and eventual return to work in October.

61. Kreuger acknowledged that Johnston's doctor's note stated that she could return to work on October 16, 2017.

62. Nonetheless, Kreuger requested additional medical documentation indicating the "probability" that Johnston would actually be able to return to work on October 16, 2017.

63. Despite the excessive nature of the request, Johnston agreed to provide the additional medical documentation requested.

64. During the phone call, Johnston repeatedly insisted that she could perform the essential functions of her job position with or without an accommodation as she had been doing in a satisfactory manner for ten years.

65. Johnston indicated that she would need periodic sick days when she returned due to her migraines.

66. Johnston also complained about the discriminatory treatment she received from her supervisors.

67. On or about September 27, 2017, Fender denied the extension of Johnston's requested medical leave, and claimed that "there is not an appropriate accommodation that would allow [her] to perform the necessary job duties…."

68. Fender neglected to identify any essential functions that Johnston could not perform.

69. Fender also did not claim that providing an additional 19 days of leave would amount to undue burden.

70. In response to Fender's September 27, 2017 letter, Johnston requested

reassignment to a vacant position as an accommodation.

71. Fender responded with a termination letter on October 10, 2017.

## COUNT I
## DISCRIMINATION UNDER THE AMERICANS WITH DISABILITIES ACT

72. Plaintiff reasserts and realleges each and every allegation in this complaint as if fully set forth herein.

73. The ADA prohibits discrimination against a qualified individual with a disability in regard to terms, conditions and privileges of employment. 42 U.S.C. § 12112(a).

74. Plaintiff has a physical or mental impairment that substantially limits a major life activity.

75. In the alternative, the length of time during which Plaintiff has experienced symptoms, and for which she will continue to suffer from, constitutes a record of impairment.

76. In the alternative, Plaintiff was regarded as having a disability under the ADA.

77. Defendant is an employer under the ADA.

78. Defendant knew of Plaintiff's physical and mental limitations.

79. Defendant treated Plaintiff disparately as compared to other similar situated non-disabled employees because of her disability.

80. Plaintiff is qualified to perform the essential functions of her position.

81. Defendant failed to accommodate Plaintiff.

82. Defendant requested excessive medical documentation.

83. Defendant failed to engage in the interactive process in good faith.

84. Defendant discriminated and retaliated against Plaintiff by failing to provide her with reasonable accommodations, failing to engage in the interactive process in good faith, and terminated her due to her disabilities. See 42 U.S.C. § 12112(b).

85. Accommodating Plaintiff's reasonable requests would not inflict undue hardship on Defendant.

86. Plaintiff's reasonable requests would not pose a direct threat to the health or safety of other individuals in the workplace.

87. Plaintiff's disability was the but-for cause of Defendant's discriminatory conduct.

88. As a direct, intentional, and willful consequence of such illegal conduct, Plaintiff suffered adverse employment actions including, *inter alia*, termination of employment.

89. As a result, Plaintiff has been damaged in an amount to be proven at trial.

### COUNT II
### RETALIATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

90. Plaintiff reasserts and realleges each and every allegation in this complaint as if fully set forth herein.

91. The ADA prohibits discrimination against any individual because such individual engaged in protected activity under the ADA. See 42 U.S.C. § 12203(a).

92. Plaintiff engaged in protected activity by requesting reasonable accommodations under the ADA and by complaining of disability discrimination on multiple occasions.

93. Defendant retaliated against Plaintiff by failing to provide her with

reasonable accommodations and terminated her due to her complaints.

94. Plaintiff's complaints was the but-for cause of Defendant's retaliatory conduct.

95. As a direct, intentional, and willful consequence of such illegal conduct, Plaintiff suffered adverse employment actions including, *inter alia*, termination of employment.

96. As a result, Plaintiff has been damaged in an amount to be proven at trial.

## CONCLUSION AND PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against Defendant Fender, as follows:

A. An award of damages for all counts in an amount to be proven at trial;

B. An award of compensatory and punitive damages in an amount to be proven at trial;

C. An award of back pay and front pay;

D. Pre- and post-judgment interest;

E. Reasonable attorneys' fees, costs and other expenses;

F. Any other remedies or judgments deemed just and equitable by this Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

RESPECTFULLY SUBMITTED January 9, 2018.

**ZOLDAN LAW GROUP, PLLC**

By: /s/ Jessica Miller
14500 N. Northsight Blvd., Suite 213
Scottsdale, AZ 85260
Attorneys for Plaintiff Kimberley Johnston

**VERIFICATION**

Plaintiff Kimberley Johnston declares under penalty of perjury that she has read the foregoing Verified Complaint and is familiar with the contents thereof. The matters asserted therein are true and based on her personal knowledge, except as to those matters stated upon information and belief, and as to those matters, she believes them to be true.

_____
Kimberley Johnston